# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | |
|---|---|
| **RONALD G. GODFREY** | **CIV. ACTION NO. 04-2052** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **AAB AMUSEMENT COMPANY, INC., ET AL.** | **MAG. JUDGE JAMES D. KIRK** |

# RULING

Plaintiff Ronald G. Godfrey ("Godfrey") brought this lawsuit against his former employers, AAB Amusement Company, Inc. ("AAB") and Brushy Development Corp. ("Brushy"); Bryan R. Ashley ("Ashley"), the president of both entities; and Colony Insurance Company ("Colony")[1], the insurer for AAB and Brushy. In connection with his termination, Godfrey alleges that AAB, Brushy, and Ashley (collectively, "the AAB Defendants") breached a contract of employment with him, violated the Employee Polygraph Protection Act of 1988, 29 U.S.C. §§ 2001, *et seq.*, and violated state laws against defamation and invasion of privacy.

Pending before the Court are cross Motions for Summary Judgment. The AAB Defendants have filed a Motion for Summary Judgment [Doc. No. 31] seeking judgment as a matter of law on all Godfrey's claims against them. In response, Godfrey has filed a Motion for Partial Summary Judgment [Doc. No. 33] seeking judgment in his favor as to liability.

Briefing by all parties is complete. For the following reasons, the Motion for Summary Judgment filed by the AAB Defendants is GRANTED IN PART and DENIED IN PART. The Motion for Partial Summary Judgment filed by Godfrey is DENIED.

---

[1]Godfrey named Colony Agency Services, Inc. as Defendant; however, the proper entity is Colony Insurance Company.

# I.      FACTS AND PROCEDURAL HISTORY

Prior to his employment with the AAB Defendants, Godfrey was an agriculture teacher at Newellton High School, where Ashley was one of his students. A few years later, Ashley had married, and he and his wife began acquiring properties to use as video poker rooms. To supplement his teaching income, Godfrey obtained a job working part-time in a video poker room for one of Ashley's companies.

In March 1997, Ashley approached Godfrey about a full-time position with AAB and Brushy. Ashley wrote out the following proposed terms of employment on a piece of paper:

> 500.00 per wk Salary
> 2500.00 Bonus December
> ½ Health Insurance (Ronnie)
> 1 week paid vacation per year
> Any location you find, when poker's are on line
> Receive 500.00 and 2% of Revenue AAB receives,
> Excluding Joe Storey Contracts–
> Vehicle

[Doc. No. 31, Deposition of Ronald G. Godfrey ("Godfrey Dep."), Exhibit G-1 attached to deposition]. Godfrey contends that Ashley stated that Godfrey's employment would be a "long-term thing" and that it could "work into something really good." [Doc. No. 31, Godfrey Dep., at 32]. After consideration, Godfrey accepted what he believed to be an employment contract with Ashley. Godfrey began his employment as a supervisor for AAB and Brushy on March 13, 1997.

During his employment, Godfrey received a $500 weekly salary and an annual bonus of at least $2,500. Although the document prepared by Ashley stated that AAB would pay only one-half of Godfrey's health insurance premiums, AAB paid all the insurance premiums for Godfrey and his family. AAB also paid him commissions on new poker machine contracts and provided him with a vehicle.

Brushy owned and operated an automated teller machine ("ATM") located in an AAB poker room at the Tallulah Truckstop.[2]  The ATM was maintained by an AAB office assistant, Verlene Almond ("Almond").  Almond would write a check drawn on Brushy's account, have the check signed by Ashley or his wife, cash the signed check at the bank, and deposit the money into the ATM.  If no one was going to the bank that day, AAB sometimes loaned cash from its safe to deposit into the ATM, and AAB was repaid by Brushy once its check was cashed.  Although Almond was primarily responsible for maintaining the cash in the ATM, Godfrey also had access to the ATM and occasionally deposited money into it.

Some time in October or November 2003, Ashley reviewed Brushy's financial records and realized that the company was not earning a profit on its ATM and that the ATM appeared to be out of balance.  Ashley told his wife, who notified the ATM company.  They also asked David Richards ("Richards"), a CPA, to investigate the missing money.  At the conclusion of his investigation, Richards determined that AAB had incurred a theft loss of $38,000 from the ATM.  According to Richards, there was a deficiency between the amount of the Brushy checks cashed and the amount of money deposited into the ATM.  Richards provided his findings to the Madison Parish Sheriff's Department ("Sheriff's Department"), which began a criminal investigation into the theft.

On November 21, 2003, Ashley and Godfrey were at work.  Ashley told Godfrey that the Sheriff's Department wished to question the two of them about a discrepancy with the ATM at the Tallulah Truckstop.  Ashley drove the two of them to the Sheriff's Department where they were questioned separately by deputies.  During questioning by Deputy Neil Horath, Godfrey denied knowing anything about the money missing from the ATM.  However, when Deputy

---

[2]Brushy owned the Tallulah Truckstop as well.

Horath stated that the Sheriff's Department might want Godfrey to take a polygraph examination, Godfrey said that he was not comfortable with that idea.

A short time later, Ashley and Godfrey drove back to work together. On the way, Ashley says that Godfrey appeared nervous and said that the Sheriff's Department was "pointing their finger" at him. [Doc. No. 31, Deposition of Bryan Ashley ("Ashley Dep."), at 32]. Ashley returned to the Sheriff's Department alone and learned from deputies that Godfrey allegedly refused to take a polygraph examination.

After obtaining this information, Ashley went back to the Tallulah Truckstop and questioned Godfrey about whether he was willing to take a polygraph examination. When Godfrey again expressed reservations, Ashley allegedly said that the Sheriff's Department told him to place Godfrey on indefinite suspension if he refused to take the polygraph.[3]

Following this conversation, Godfrey's employment terminated, either because he voluntarily resigned or because he was constructively discharged.[4] Since his termination, AAB has not paid Godfrey wages for his last eight days of employment, any commissions, or his annual bonus.

During the criminal investigation, Ashley was in contact with District Attorney Buddy Caldwell ("Caldwell"). Caldwell allegedly reviewed Ashley's insurance policy and told him that if he obtained any type of conviction against Godfrey, Ashley could force his bonding company

---

[3]Ashley denies that he made this statement, but for purposes of summary judgment, the Court assumes it to be true.

[4]While the parties disagree about the specific statements made by Ashley and Godfrey, they agree that Godfrey's last day of employment was November 21, 2003.

to reimburse AAB for the stolen funds.[5]

Following Godfrey's termination, Ashley completed a Notice of Discovery to Western Surety Company, the bonding company for AAB. In that document, Ashley checked a box on the form indicating that he knew of no other act of fraud or dishonesty by Godfrey. Also in that document, Ashley states that Godfrey was terminated because he was "questioned by sheriff department investigators, refusing polygraph and being a strong suspect."

Ashley now contends there were several indications that Godfrey might be responsible for the ATM theft. First, Ashley thinks it was "pretty strange" that Godfrey did not volunteer to help with the ATM investigation. [Doc. No. 31, Ashley Dep., at 84]. Second, there were some ATM tickets showing that money was withdrawn at a time when Godfrey was allegedly the only employee working, and another employee allegedly saw Godfrey remove money from the ATM. Third, according to Ashley, Godfrey had recently spent money to buy a new vehicle, remodel his house, and take several short vacations. Finally, there were a couple of incidents in the past that "played in the back of [Ashley's] head." [Doc. No. 31, Affidavit of Bryan Ashley ("Ashley. Aff.")]. In one instance, Ashley recalls that Godfrey submitted a gas receipt for reimbursement twice (although he later repaid the money). In another instance, he recalls that another employee previously accused Godfrey of stealing money.

Although Godfrey was never arrested nor charged with felony theft, in February 2004, he agreed to plead guilty to a violation of Louisiana Revised Statute 14:68, unauthorized use of a moveable having a value of less than $1,000. On the day of his plea, a hearing was held in Tensas Parish Courthouse, rather than Madison Parish where the ATM was located. Godfrey

---

[5]Brushy, although the owner of the ATM, did not have fidelity insurance against the loss.

was permitted to enter the courthouse by the back door, and his plea hearing and sentencing were taken up as the last matter on the court docket that day. Although he only pled guilty of use of a moveable of less than $1,000, he admitted as part of his plea agreement that the actual amount was greater than $1,000. Godfrey was not represented by an attorney during the plea process, and he now denies any involvement in the ATM theft. He contends that his brother-in-law, an investigator for the Sheriff's Department, told him that pleading guilty to this crime would be no more significant than having a traffic ticket, and, therefore, he believed that it was in the best interest of his family to plead guilty.

In March and April 2004, Ashley took out advertisements in a Madison Parish newspaper on two separate occasions. The advertisements stated as follows:

THANK YOU

> A special thanks to the Madison Parish Sheriff's Department and Sixth Judicial District Attorney's Office for the conviction and future payment for the theft of over $38,000.00 taken from the Conoco Truck Stop ATM Machine.
>
> Bryan and Theresa Ashley and all employees of AAB Amusement and Conoco Truck Stop

On or about April 22, 2004, Godfrey made a formal, written demand on AAB for the withheld wages, bonuses and commissions, but still has not received any payments.

Some time in 2004, Ashley terminated Almond for stealing $5,000.

On September 28, 2004, Godfrey filed a Petition for Damages in this Court.

On July 15, 2005, the AAB Defendants filed a Motion for Summary Judgment.[6] On July 18, 2005, in response, Godfrey filed a Motion for Partial Summary Judgment. Briefing is now

---

[6]Colony also filed a Motion for Summary Judgment seeking a declaration from this Court that Godfrey's claims are not covered by policies issued to AAB and Brushy. That motion will be ruled upon separately.

complete on both motions, and the Court is prepared to rule.

## II.     LAW AND ANALYSIS

### A.     Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact.  *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*   The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case.  *Ashe v. Corley*, 992 F.2d 540, 543  (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial.  *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim."  *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  The nonmoving party must show more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd.  v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In evaluating the evidence tendered by the parties, the court must accept the evidence of

the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

**B.      Breach of Contract**

Godfrey has asserted a breach of contract claim on the basis of the handwritten document Ashley provided to him prior to his acceptance of a job with AAB and Brushy in March 1997. The AAB Defendants contend that there was no meeting of the minds between the parties, and, even if the document were an employment contract, it is unenforceable because Godfrey was employed at will. Godfrey contends that the document contains all elements necessary for the formation of a valid contract except its indefinite term. Under Louisiana case law, Godfrey contends that he need not show that his contract was of limited duration because he provided special consideration to AAB and Brushy in addition to the services he promised to perform.

**1.      Meeting of the Minds**

A party claiming the existence of a contract has the burden of proving the contract existed. *The Hunter Co., Inc. v. Commissioners of Bossier Levee Dist. of La.*, No. 9062, 115 So.2d 226 (La. App. 2 Cir. 1959). Four elements are necessary for the formation of a valid contract: capacity of the parties, mutual consent to the contract, lawful cause or reason for the obligation, and a certain lawful object or purpose for contracting. *See* La. Civ. Code arts. 1918, 1927, 1966, and 1971. In this case, the parties dispute whether there was mutual consent to the contract, or, as it is more commonly known, whether there was a meeting of the minds.

Article 1927 of the Louisiana Civil Code, which governs consent to contracts, provides:

A contract is formed by the consent of the parties established through offer and acceptance.

Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the

circumstances is clearly indicative of consent.

Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made.

La. Civ. Code Ann. art. 1927. "[W]hether the parties intended to and did enter into a contract is generally an issue of fact." *Turner Marine Fleeting, Inc. v. Quality Fab and Mech., Inc.*, 2002 WL 31819199 (E.D. La. 2002)(citing *Trinity Carton Co., Inc. v. Falstaff Brewing Corp.*, 767 F.2d 184, 190-191 (5th Cir.1985)).

The Court finds there is a genuine issue of material fact as to whether the parties mutually agreed to enter into a contract of employment. Although Ashley characterizes the handwritten document as his "notes," there is no dispute that he provided the document to Godfrey. Godfrey testified that he reviewed the terms with his wife and relied upon them in making his decision to accept an employment offer from Ashley. Under these circumstances, the AAB Defendants are not entitled to summary judgment on the basis that there is no meeting of the minds. Likewise, Godfrey is not entitled to summary judgment on the issue of liability under the contract.

## 2. Employment Status

The AAB Defendants also argue that the alleged contract is unenforceable because Godfrey's employment was of indefinite duration.

In *Seals v. Calcasieu Parish Voluntary Council on Aging, Inc.*, 99-1269 (La. App. 3 Cir. 3/1/00); 758 So.2d 286, the Louisiana Third Circuit Court of Appeals stated as follows:

There are two types of contracts for hire: terminable at will and limited duration. *Brodhead v. Board of Trustees for State Colleges and Univs.*, 588 So.2d 748 (La. App. 1 Cir. 1991), *writ denied*, 590 So.2d 597 (La. 1992). In *Pitcher v. United Oil Gas Syndicate*, 174 La. 66, 139 So. 760 (1932), the court recognized a third type, that of indefinite duration, when certain requirements are met. A contract is terminable at will when an employer is at liberty to dismiss an employee without

assigning any reason for doing so, and the employee may terminate her employment without assigning any cause. La. Civ. Code art. 2747. Under a limited duration contract, an employee can only hire out her services for certain limited time or for the performance of a certain enterprise. La. Civ. Code art. 2746. Permanent contracts of employment are generally against public policy.

An employee is never presumed to engage his services permanently, thereby cutting himself off from all chances of improving his condition; indeed, in this land of opportunity it would be against public policy and the spirit of our institutions that any man should thus handicap himself; and the law will presume almost juris et de jure that he did not so intend.

[*Pitcher*,] . . . 139 So. at 761.

However, a contract of indefinite duration will be upheld when the employee gives "special consideration," in addition to the services he has promised to perform.

[I]f the employee has given, in addition to the services which he promised to perform, a consideration, whatever the nature of such consideration be, then he has in effect purchased, for valuable consideration, an option to keep the employment from the term specified; and such a contract is a valid one.

[*Pitcher*, 139 So. at 761].

*Id.* at 289. Although the cases do not identify the "special consideration" necessary to create an enforceable contract of employment, they suggest that "such activities as where an employee closed out an ongoing business to do work of the same nature for someone else; gave his employer a secret formula for manufacturing a special product; or settled a personal injury claim against his employer in return for lifetime employment" may meet the standard. *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 517-18 (5th Cir. 1994).

In this case, Godfrey believed that his alleged contract was to "last perpetually" and that it "was what we would be doing from now on . . . until retirement." [Doc. No. 33, Godfrey Dep., at 60]. In spite of the indefinite nature of this alleged employment contract, Godfrey contends that he "purchased the option to keep his employment" by performing functions such as hauling

horses to and from Shreveport, Louisiana, and "jack-of-all trade functions." [Doc. No. 43, at 7; Doc. No. 33, Godfrey Dep., at 45]. Godfrey argues that these functions "would not have been and could not have been contemplated at the inception of a contract related solely to the operations of a business engaged in video poker." [Doc. No. 43, at 7]. However, during his deposition, Godfrey also testified that Ashley hired him as his "assistant" and to "help" him, and he further stated that he and Ashley did "whatever" needed to be done for the businesses. [Doc. No. 33, Godfrey Dep., at 29, 45-46].

The Court finds that the duties performed by Godfrey are not the type of additional or special consideration contemplated by the Louisiana Supreme Court in *Pitcher*. According to Godfrey's testimony, he knew from the beginning of his employment that he would work as Ashley's assistant and perform whatever duties needed to be done in order to help Ashley and AAB and Brushy. While hauling horses may not have been the normal focus of a gaming company, it was within the realm of his duties to "assist" Ashley, particularly in light of Godfrey's prior employment and work history. Therefore, the Court finds that the alleged employment contract is unenforceable.

Finally, Godfrey argues that, even if other provisions are not enforceable, the Court should sever the provisions relating to commissions and benefits and enforce those terms. The Court is not persuaded. The terms of Godfrey's employment were set forth in one writing and physically given to Godfrey. All the terms in the alleged contract rise and fall together.

The AAB Defendants are entitled to summary judgment on Godfrey's breach of contract claim, and this claim is dismissed with prejudice. The Court expresses no opinion, however, as to whether Godfrey may have stated a claim for unpaid salary or commissions under Louisiana's Wage Payment Act, La. Rev. Stat. §§ 23:631-632, or as part of the damages claimed under the

Employee Polygraph Protection Act of 1988.

### C.     Employee Polygraph Protection Act

Godfrey also asserts a claim pursuant to the Employee Polygraph Protection Act of 1988

("EPPA"), 29 U.S.C. § 2002, *et seq.*  In pertinent part, the EPPA provides:

> Except as provided in sections 2006 and 2007 of this title, it shall be unlawful for any employer engaged in or affecting commerce or in the production of goods for commerce--
>
> (1)     directly or indirectly, to require, request, suggest, or cause any employee or prospective employee to take or submit to any lie detector test;
>
> . . .
>
> (3)     to discharge, discipline, discriminate against in any manner, or deny employment or promotion to, or threaten to take any such action against--
>
> > (A)     any employee or prospective employee who refuses, declines, or fails to take or submit to any lie detector test . . .

29 U.S.C. § 2002.

First, the AAB Defendants contend that Godfrey cannot state a claim under the EPPA

because Ashley did not actively participate in the Sheriff's Department's request that Godfrey

take a polygraph examination.  Godfrey agrees that "mere passive cooperation" with the police

during a criminal investigation does not violate the EPPA.  However, he argues that either there

was no true criminal investigation and the AAB Defendants are liable for an illegal private

investigation or Ashley actively participated in the criminal investigation.  He also contends that

the AAB Defendants are liable in any case because Ashley violated the EPPA by making use of

information obtained during the investigation.

Department of Labor regulations provide "[e]mployers who cooperate with police

authorities during the course of their investigations into criminal misconduct are not deemed

engaged in prohibitive conduct provided that such cooperation is passive in nature." 29 C.F.R. § 801.4(b). The regulations explain that "[a]llowing a [polygraph] test on the employer's premises, releasing an employee during working hours to take a test at police headquarters, and other similar types of cooperation at the request of the police authorities would not be construed as 'requiring, requesting, suggesting, or causing, directly or indirectly, any employee . . . to take or submit to a lie detector test.'" 29 C.F.R. § 801.4(b).

Godfrey cited the Court to the only case which appears to have analyzed this regulation: *Mennen v. Easter Stores*, 951 F. Supp. 838 (N.D. Iowa 1997). In *Mennen*, an employee sued his former employer, a grocery store, under the EPPA. After Mennen was implicated in a theft from a cash register, the police asked the employer to allow employees to take a polygraph examination. *Id.* at 845. After receiving the employer's permission, the police then requested that Mennen and another employee take a polygraph examination at the police department. Both employees agreed. After the examination was completed, a police detective communicated to the store manager that Mennen failed the polygraph examination and that he believed Mennen to be the thief, but the police did not pursue criminal charges against Mennen. *Id.* at 846. The chief executive officer and the store manager decided to remove Mennen from the grocery manager position permanently and prohibited him from having any cash handling duties. *Id.* No disciplinary action was taken against the other employee, who passed the polygraph examination. Mennen filed suit against the store alleging violations of the EPPA on the basis of his demotion and constructive discharge.

At the conclusion of a bench trial, the district court analyzed Mennen's claims that his former employer violated the EPPA by (1) causing him to take a polygraph examination, (2) using the results of the polygraph examination, and (3) demoting him based on the results of the

polygraph examination. *Id.* at 848. Pointing out the dearth of case law on this subject, the district court provided a detailed account of the EPPA's legislative history before reviewing Mennen's claims.

As to Mennen's first claim, that his employer "caused" him to take the polygraph examination, the court concluded that the employer did not cross the line between passive cooperation and active participation in the investigation. While "not . . . free from all doubt," the court found that the employer did not participate in the investigation merely by giving the police permission to ask Mennen to take a polygraph examination when, at that time, the employer was not taking an active role in the investigation, had not used the results from the examination, and had not taken an adverse employment action against Mennen. *Id.* at 853.

As to Mennen's remaining claims, the court found that the employer did violate the EPPA by using the results of the polygraph examination and by disciplining Mennen on the basis of those results. The employer argued that the polygraph examination was merely the "'final piece of the puzzle' leading to its decision to remove Mennen from his position as grocery manager." *Id.* at 854. However, the employer failed to invoke the on-going investigation exemption or to meet its stringent requirements, and, under these circumstances, the district court construed the EPPA narrowly to find that the results of a polygraph examination may not be any part of the consideration in disciplining an employee. *Id.* at 855. Even if it had read the EPPA more broadly, the court explained that it would have reached the same decision in this case because the evidence at trial showed that no disciplinary action had been taken against Mennen until the results of the polygraph examination were received. Accordingly, the district court entered judgment in favor of Mennen.

In this case, the Court finds that Godfrey has raised a genuine issue of material fact for

trial on the first type of claim under the EPPA: that Ashley directly or indirectly required, requested, or suggested that Godfrey submit to a polygraph examination. Unlike the employer in the *Mennen* case, Ashley initiated a private theft investigation using a C.P.A. to determine if a theft had occurred. The C.P.A. provided his audit to the Sheriff's Department to be used in its criminal investigation. After the criminal investigation began, Ashley came to Godfrey's office and told him that the Sheriff's Department wished to question both of them. Ashley drove himself and Godfrey to the Sheriff's Department for individual interviews with deputies. There is no record evidence that Ashley knew the Sheriff's Deputy intended to ask Godfrey to submit to a polygraph examination, but, according to Godfrey, the deputy who made the request did not press Godfrey to take the examination once he refused. Ashley also testified that the deputies thought it was "fine" that Godfrey had refused. [Doc. No. 31, Ashley Dep., at 32]. Instead, it was Ashley who pressed the issue once he learned from the Sheriff's Department that Godfrey had refused to take the examination. While the Court does not express any opinion on the success of Godfrey's claim at trial, the facts are such that the jury should decide whether Ashley, acting on behalf of AAB and Brushy, violated Section 2002(1) by directly or indirectly requiring or suggesting that Godfrey take a polygraph examination.

The Court also finds that Godfrey has raised a genuine issue of material fact for trial that he was disciplined because of his refusal to take a polygraph examination. Godfrey and Ashley rode back together to the office from the Sheriff's Department without any discussion of Ashley's alleged suspicion of Godfrey and without any mention of discipline. Instead, it was only after Ashley learned from the Sheriff's Department that Godfrey had refused to take a polygraph examination that Ashley questioned Godfrey further. If the jury accepts Godfrey's testimony as credible, then it could conclude that Ashley suspended Godfrey. This theory of the

case is buttressed by Godfrey's employment records and Ashley's statement on the bonding claim form that Godfrey had been terminated because he was "questioned by sheriff department investigators, refusing polygraph and being a strong suspect."

Finally, the Court finds that there is a genuine issue of material fact as to whether the AAB Defendants can prove their entitlement to the benefit of the on-going investigation exemption to the EPPA.[7]

Although the effect of EPPA has been to severely limit the use of polygraph examinations in private employment, in Section 2006(d) of the EPPA, Congress recognized an exemption for an "ongoing investigation" of an employee's possible theft. Under Section 2006(d), the EPPA does not "prohibit an employer from requesting an employee to submit to a polygraph test if" the following requirements are met:

(1)     the test is administered in connection with an ongoing investigation involving economic loss or injury to the employer's business, such as theft, embezzlement, misappropriation, or an act of unlawful industrial espionage or sabotage;

(2)     the employee had access to the property that is the subject of the investigation;

(3)     the employer has a reasonable suspicion that the employee was involved in the incident or activity under investigation; and

(4)     the employer executes a statement meeting additional requirements.[8]

*See* 29 U.S.C. § 2006(d). This exemption does not apply

---

[7]Godfrey argued that the AAB Defendants were not entitled to avail themselves of the defense provided by the on-going investigation exemption because of their failure to affirmatively plead the defense. Since that time, the Court has permitted the AAB Defendants to amend their answer to state this defense.

[8]The fourth element is not at issue in this case because Godfrey was terminated before he underwent a polygraph examination.

if an employee is discharged, disciplined, denied employment or promotion, or otherwise discriminated against in any manner on the basis of the analysis of a polygraph test chart or the refusal to take a polygraph test, without additional supporting evidence. The evidence required by such subsection may serve as additional supporting evidence.

29 U.S.C. § 2007(1).

The Court finds that the AAB Defendants have produced evidence meeting the first two requirements of the exemption: (1) the polygraph test was to be administered in connection with an ongoing investigation involving a theft at the employer's business, and (2) Godfrey had access to the ATM that was the subject of the investigation.

However, the Court finds that the AAB Defendants are not entitled to summary judgment because there is a genuine issue of material fact for trial whether Ashley's suspicion of Godfrey was reasonable at the time Godfrey was terminated. Godfrey has testified that he denied having anything to do with the theft or knowing anything about it. While Ashley believes Godfrey acted strangely by not assisting in the investigation the way Ashley thought he should, Ashley has not indicated that he truly suspected Godfrey of the theft until after they were both questioned by Sheriff's deputies. Even at that point, he says only that Godfrey was "nervous" and told Ashley that deputies were trying to "point[] their finger" at him. [Doc. No. 31, Ashley Dep., at 32]. While Godfrey did have access to the ATM, so did another employee, Almond, who was later terminated for theft. In fact, Ashley admitted that when he and Godfrey went to the Sheriff's Department, deputies "wanted to question everyone involved with the ATM." [Doc. No. 31, Ashley Dep., at 31]. A jury could potentially determine that Godfrey was not a "strong suspect" in Ashley's mind until Ashley returned to the Sheriff's Department and learned from a detective that Godfrey had refused to take a polygraph examination. At the point that Ashley allegedly questioned Godfrey about taking a polygraph examination, there is a genuine issue of material

fact as to whether his suspicion of Godfrey was "reasonable."

For the same reasons, even if the on-going investigation exemption were applicable, Godfrey has raised a genuine issue of material fact for trial under § 2007(1) that he was terminated for refusing to take a polygraph examination without additional supporting evidence. Although Ashley has stated that some of the cash withdrawals occurred when Godfrey was the only employee working and that another employee saw Godfrey withdraw cash, it is unclear whether Ashley had this knowledge prior to Godfrey's termination. Similarly, Ashley now recalls that Godfrey had increased his spending habits prior to the theft and that there were two earlier incidents involving Godfrey which now seem suspicious. However, he did not testify that either Godfrey's spending or the earlier incidents came to mind prior to Godfrey's refusal to take the polygraph examination. Regardless, the Court cannot assume, as a matter of law, that Godfrey's spending habits and two tenuous incidents from the past would meet the "additional supporting evidence" requirement of § 2007(1).

The Court further notes that Godfrey's guilty plea, three months after his termination, is of no consequence to its determination at the summary judgment stage. For purposes of the EPPA, the Court is not concerned with whether or not Godfrey was guilty of the ATM theft. The issue is whether there was sufficient evidence to support Godfrey's termination on November 21, 2003, other than his refusal to take a polygraph examination. The Court finds that there is a genuine issue of material fact for trial as to whether Ashley had sufficient additional supporting evidence to terminate Godfrey.

Under these circumstances, the AAB Defendant's Motion for Summary Judgment, and Godfrey's Motion for Partial Summary Judgment on the EPPA claim are both DENIED.

**D.      42 U.S.C. § 1983**

The AAB Defendants move for summary judgment on any claim by Godfrey pursuant to 42 U.S.C. § 1983.  Godfrey does not appear to have responded to this argument, and it is unclear whether he continues to pursue a Section 1983 claim.  As noted by the AAB Defendants, to establish a claim under Section 1983, a plaintiff must prove (1) that he was deprived of an existing federal right and (2) that the deprivation occurred under color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).  Because the only federal claim asserted in this matter is pursuant to the EPPA, Godfrey has no separate action under Section 1983.  The AAB Defendants' Motion for Summary Judgment on Godfrey's Section 1983 claim is GRANTED.

**E.      Wrongful Termination**

Although Godfrey asserted a claim for wrongful discharge in violation of public policy in his Petition, it is unclear whether he continues to assert this claim.  Regardless, as Defendants correctly note, wrongful termination in violation of public policy is not a cause of action recognized under Louisiana law in the absence of a statutory exception.  *See* La. Civ. Code art. 2747.  The AAB Defendants' Motion for Summary Judgment on Godfrey's wrongful termination claim is GRANTED.

**F.      Defamation**

Godfrey also asserted a defamation claim against the AAB Defendants.  Under Louisiana law, a defamation has four necessary elements: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury.  *Trentecosta v. Beck*, 96-2388, 703 So.2d 552, 559 (La.10/21/97) (citing *Restatement (Second) of Torts* § 558 (1977)).

In this case, Godfrey contends he was defamed in advertisements that Ashley placed on

behalf of AAB and Brushy in the local newspaper. Although Godfrey is not mentioned by name, the advertisement thanks the Sheriff's Department and the Sixth Judicial Court "for the conviction and future payment for the theft of over $38,000.00." Theft of over $38,000 would constitute a felony under Louisiana law. Because Tallulah is a small town, Godfrey claims that "only those under a rock . . . would not have known about" the theft at the Tallulah Truck Stop.

However, even if Godfrey is correct that most people in Tallulah knew about the theft, the advertisements do not identify Godfrey, and he does not argue that the people in Tallulah knew to whom the advertisements referred. Accordingly, the AAB Defendants' Motion for Summary Judgment on Godfrey's defamation claim is GRANTED.

G.     **False Light Invasion of Privacy**

Godfrey also makes the related claim that the AAB Defendants are liable for invasion of privacy because the local newspaper advertisements placed him in a false light. *See Jaubert v. Crowley Post-Signal, Inc.*, 375 So.2d 1386, 1388 (La.1979); *Hines v. Arkansas Louisiana Gas Co.*, 613 So.2d 646, 658 (La. App. 2 Cir. 1993). "A claim for false light invasion of privacy arises from publicity that unreasonably places the plaintiff in a false light before the public." *Simpson v. Perry*, 2003-0116, 887 So.2d 14, 16 (La. App. 1 Cir. 7/14/04). When analyzing a claim for false light invasion of privacy, the Court considers three elements: privacy interest, falsity, and unreasonable conduct. *Perere v. Louisiana Television Broad. Corp.*, 00-1656, 812 So.2d 673, 676 (La. App. 1 Cir. 9/28/01).

As with a defamation claim, in order to be placed in a false light, a plaintiff has to be identified in some way to have a privacy interest. For the same reasons discussed above, the Court finds that Godfrey was not sufficiently identified. Accordingly, the AAB Defendants' Motion for Summary Judgment on Godfrey's invasion of privacy claim is GRANTED.

### III.     CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment [Doc. No. 31] filed by the AAB Defendants is GRANTED IN PART and DENIED IN PART.  As to Godfrey's breach of contract, defamation, invasion of privacy, and Section 1983 claims, the Motion for Summary Judgment is GRANTED.  As to Godfrey's EPPA claim, the Motion for Summary Judgment is DENIED.

The Motion for Partial Summary Judgment [Doc. No. 33] filed by Godfrey is DENIED.

MONROE, LOUISIANA, this 6th day of October, 2005.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE